Yes, thank you, Judge Moore. Your Honor, may I take the witness on board here? No. I concur. This morning, I'd like to move the admission of Jing Yan Law, who is a member of the Bar and is in good standing with the highest courts of California. I have knowledge of her credentials and am satisfied that she possesses the necessary qualifications. I've known Ms. Law for two and a half years now, when I went out to interview her for a potential clerkship position when she was then still a law student at Berkeley. And I knew immediately within five minutes of meeting her that she was a total dynamo and legal eagle. We talked about divided infringement, Section 101, and the Biosimilar Act. She told me I was wrong in Amgen v. Sandoz. I have forgiven her about that, but she gave a very cogent analysis of why I was wrong. Nine people down the street disagreed, but it doesn't matter. She has really helped me over the past 14 months as a clerk. She's really helped me think more deeply about the issues, helped me from making mistakes, and it's really been a joy working with her. She has excellent character, excellent writing ability, and analytical ability. I know she will be an asset to our Bar. I recommend that she be admitted. Fine law school. Any objections? No objections. Okay, well, with such a sterling recommendation from Judge Chen, the motion is granted. Would the clerk please square in? Please raise your right hand. Do you solemnly swear or affirm that you will comport yourself as an attorney and counsel of this court, uprightly and according to law, and that you will support the Constitution of the United States of America? I do. Welcome to the Board of the United States Court of Appeals for the Federal Circuit. Thank you. Okay, our first case for this morning, 2017-1825, Kumar v. Yanku. Mr. Bretschneider, please proceed. Good morning. May it please the Court. My colleague, Peter Knutson, is with me at the counsel table. The case before the Court is somewhat unusual in that the director, in a sense, admits that the Board's claim construction was incorrect and proposes an alternative claim construction upon which the director urges the Court to affirm the Board's decision. Putting aside— Well, the green brief agrees with the Board that your patient population clauses in the preamble are not entitled to patentable weight, and that's really the crux of the case, isn't it? Well, it is and it isn't. The reason I brought this case, this issue up first, Your Honor, is that under the Administrative Procedure Act, this Court reviews the decision of the Board as presented and not as rewritten by the director. However, both the Board and the director are wrong in this case in that the in need of recitation in Claim 1 of Kumar, for example, is a limitation. This is just like the Janssen case, which is discussed in the briefs extensively. In Janssen, the method claimed there was a method for treating megaloblastic anemia comprising the administration of, I think it was folic acid or something like that. And the question was, what effect legally did the in need of limitation have in the Janssen claims? And it was exactly the same situation as here. The person in need of was found to refer back to the preamble. The person in need of was the person in need of treatment for megaloblastic anemia. In this case, the person in need of is the person in need of treatment, I'm sorry, for the reduction or alleviation of inter-individual platelet response variability and metabolic loading. And in the context, agreed, of the treatment of embolisms and thrombosis. But only after these side effects, inter-individual platelet response variability and metabolic loading have been observed. So in this case, the director's reconstruction of the board's decision is just as part of the preamble. Let me see if I can understand your argument. Are you arguing that we should, in the body of the claim, I see a single step, administering S-oxo, an effective amount of S-oxo, right? Are you suggesting that given the language in the preambles, we should be thinking of the claim as including two additional steps, administering Clopidogrel to a inter-individual variability, and then for the people that are not good responders, the Clopidogrel, now go ahead and administer S-oxo? Is that how we should interpret the claim? The claim is written. I just need an answer to that question first before I can think any further. Is that the way we should understand the construction of your claims? In the context of the claim as presented, in order to carry out the It's basically a yes. It's a yes. Okay. So we need to understand the single step presiding in the body as really having three steps. Well, as the claim is stated, you have to first administer Clopidogrel. Right. And then you have to observe that it doesn't work. Right. And then after you observe it doesn't work, for those people it doesn't work for you, administer S-oxo? You have to administer an amount that is effective. For treating the single thrombosis. Yes. This argument, is it a single method step or a multiple method step claim, is I think interesting, and I understand Your Honor's point. And the director says it's a single method step claim. Pay no attention to the context, to the raison d'etre of the invention, to the intentional purpose for which the administration step is carried out. Those are not limitations at all. However, the court and the board both have to read the claim language as a whole. And when they do. You also have to give the broadest reasonable interpretation. The broadest reasonable interpretation, Your Honor, still requires consideration of all the language in the claim. It's not reasonable to say that language doesn't count, especially here where if we're going to analyze this in terms of preamble and body, remember in the administration step it says, comprising administering to a person in need thereof. That's in the body. And that refers back to the person who has. So do you agree that the most important purpose of the invention is the treatment of thrombosis and embolisms in any patient in need thereof? That is the context in which the invention is carried out. But the invention as claimed, Your Honor, is the reduction or alleviation of these side effects in that context. Where in the 442 patent does Kumar express any type of clear intent to limit patient to persons with acute coronary symptoms who had previously been administered Clopidogrel? I don't believe that that really is the issue. There's no question of written description or enablement here, Your Honor. The question is what does the claim mean? And the board and the director both focus on portions of the patent that don't directly relate to this. The board refers in footnote 7 on page 16 of the appendix to the ---- You're taking your argument and directions away from the questioning. Yes. And I appreciate you want to make an argument, but we want to ask questions. Oh, I understand that, Your Honor. The PTAB's decision finds that reading the, quote, effective amount as that amount required for reducing or alleviating inner individual platelet response variability and metabolic loading in humans, ellipses, would not make sense chemically. And Kumar argues that that statement is not supported by any evidence. There is no evidence. I'd like you to respond to the merits of the PTO's assertion. Where in the patent specification does it say that administering Clopidogrel acts in a patient to reduce or alleviate that patient's earlier poor response to Clopidogrel, that is, Essoxone? Unfortunately, as I stand here right now, Your Honor, I cannot answer that question directly, but I would be delighted to. The thing is this issue was not presented or briefed below, and the parties did not join issue on this point. Well, can you answer this for me? Is it true that a patient remains Clopidogrel-resistant after administration of Essoxone Clopidogrel? I'm sorry? Is it true that a patient remains Clopidogrel-resistant after administration of Essoxone? It's possible, Your Honor. I don't think it matters. Wait a second. I mean, there is no evidence or argument by you that the administration of Essoxone turns an otherwise poor Clopidogrel responder into a good Clopidogrel responder. Is that fair to say? Yes, it is. There is no evidence or argument that it turns a poor Clopidogrel responder into a good Clopidogrel responder. The purpose of the invention is to overcome side effects from the administration of Clopidogrel. Oh, how do you pronounce it? Clank? Clank? I just need to know how to pronounce it. I'm just curious. That's okay.  Clopidogrel. That's how I've heard how to pronounce it. All right. Thank you. Well, what do we know? Actually, on that, what do I know? But that's how we've been pronouncing it. Okay. Thank you. The problem here is that you've obviously raised good points. The bench raises them. They have to be good points. But the question is what do the claims actually say and what does the evidence of record in this case actually show? On the administrative record, we have a decision where the board says, let's forget about everything in these claims but the administration step. And the Parillo reference discloses administering S-oxo-Clopidogrel. And that's the end of it. Did the board ever construe or make an observation of what does it mean to be an effective amount? They do. And this is, by the way, this is on page and appendix 16. Appendix 16. The sentence to which the auspicious footnote 7 is attached reads, we interpret the term effective amount to be an amount of S-oxo-Clopidogrel effective in the treatment or prophylaxis of thrombosis or embolisms. Then there's footnote 7. And this is the discussion of whether the claim preamble is vague. The board never explains why it's vague. It seems pretty clear to us. But there's no argument that the words are unclear or anything like that. And we go into this in detail. Well, why isn't it what the green brief said, which is that the administration of S-oxo doesn't do anything on a chemical level to cure people that are not good responders to Clopidogrel? My response to that, Your Honor, is that if you'll look at the director's brief, they don't cite any evidence to support that. Well, I'm just trying to use a little logic and common sense here. No, Your Honor, it's not a question of common sense. Remember, you can't rely on common sense to hold inventions to be unpatentable. You can't? Actually, yes. You can't. I'm sorry, common sense, Your Honor, that doesn't arise out of something in the record. Remember, this is not like KSR. Common sense and the law are not necessarily mutually exclusive. No, this is not like KSR, in which common sense was pretty obvious. This is not common sense technology at all. Not to me, certainly. I'm not much of a chemist. But the thing is, we have to go on the administrative record and to see what are these arguments based on. They're not based on any actual evidence. For example, on page 29 of the director's brief, the director talks about the sole inventive contribution of Kumar. This is, again, you don't parse claims to determine what the sole inventive concept is. You're well into your rebuttal time. Would you like to reserve any? I would, Your Honor. Thank you. If you'll excuse my notice, I have three minutes left. Thank you very much. Mr. Craven. Good morning, Your Honors. May it please the Court. If we disagreed with you on claim construction, would we have to remand for additional fact findings on the obvious misdetermination? The normal procedure would be to remand under a new construction. Here, however, as we state in our brief, there are no undisputed facts for the Board to find. The presence of clopidogrel resistance, poor responders, non-responders, are essentially admitted prior art. It's in the background of the invention. There were statements during the prosecution history that everything was known, that the existence of these non-responders, the metabolic pathway, and the fact that it was this formula for metabolite that was causing largely the side effects of clopidogrel was already known. So on the record, as Sun argued the motion, they didn't make this argument about the claim, the preambles not being given patentable weight. They gave them patentable weight and said it was known in the art. So if this Court disagrees with the claim construction, a remand I think would be wasteful, and obvious this is a question of law that this Court can make on the undisputed facts in the record. You're saying if it would be obvious to administer S-Oxo for any patient that needs it for thrombosis, given that it was known in the art already that clopidogrel didn't work for certain people, it would be painfully obvious to administer S-Oxo to that subpopulation. That's right, Your Honor, and that's what Sun said in their motion. In fact, they were going the next step. It was obvious to treat it to these patients and, in fact, to all patients because the metabolic pathway happens in everyone. So to the extent you're giving a metabolite downstream of clopidogrel, it would be effective in all patients to treat thrombosis and embolism. And I'm going to ask your opposing counsel the other side of the coin, which is if we agree with you, do we have to go anywhere else? If you agree with the board's claim construction, Kumar doesn't make any separate argument for the obviousness decision for the independent claims or a number of the dependent claims. It's just a claim construction redox. The board made a claim construction and then didn't give patentable weight to the patient populations. So there's no separate error in the obviousness decision. There's dependent claims 10 through 14 and 16 that they make a separate argument for in terms of the board's reliance on routine experimentation. So that would be separate from the claim construction. That argument, I think, was just as they did make the separate claim. They made the claim construction argument again for those claims and then said the board erred in using routine experimentation. But there's not an error in using routine experimentation. When you have a known dosage range for clopidogrel, the Claim 7 says you will use less of the ex-oxo clopidogrel and the board affirmed that for Claim 7. So the effective amount of the ex-oxo is less and then the specific dosages in the dependent claims then would be a matter of routine experimentation. And that's a question of fact review for substantial evidence. That's correct, Your Honor. So we could return to the claim construction argument. I don't believe the director has changed the claim construction argument. It's always been the board's construction gave partial effect to the treating and prevention of thrombosis and embolism. The board expressly says that the preamble gives some basis for construing the effective amount, then said that the patient populations were just the context and did its best with not seeing steps in the claim, didn't add the additional steps of administering clopidogrel, and also, as Your Honors have noticed, they said there's no effective amount for the treatment of a clopidogrel resistance because giving the metabolite doesn't change the fact in the world about that patient's clopidogrel resistance. So unless this Court has any other questions, we'll yield the rest of my time. Mr. Bretschneider was arguing about the preambles talked about in terms of a patient in need. Yes. In need thereof. And so I think his point is that that phrase is some kind of hook to bring in the subpopulation of patients that are resided in these preambles. So what do you have to say about that? I think that hook suffers from the same problem of the effective amount argument. That is true. There are patients who are in need of a reduction or alleviation of a poor response to clopidogrel. But the administration step here of administering the metabolite doesn't solve that problem. There's no reduction or elimination of the poor response to clopidogrel. Those patients are still clopidogrel resistant. They just now can take the metabolite and have a treatment for thrombosis or embolism. That's what's chemically happening in the body with the metabolite-stopping plate rate aggregation. So I think claim 30 is a little bit more straightforward than the preamble to claim 1, where it's just a method for treating clopidogrel resistance. And there's nothing about administering S-oxo-clopidogrel that treats that patient's clopidogrel resistance. When it just comes to these subpopulation recitations and claims, I guess I'm concerned. Is it the PTO's view that they're never given patentable weight and they're always just some kind of contextual atmospheric? I guess what I'm trying to figure out is we now know more and more each day that certain subpopulations of the human race are at proclivity for this disease, that disease, or more resistant to that drug or more open to a healthy response to a different drug. So there's got to be some instances where patient population does matter and not only merely is throat-clearing language, but it's actually a key point of the claim to attention. I think that absolutely could be the case. It's not on the facts of this case. Do you have an example off the top of your head where it would actually matter and work? We could change the facts of this case. If there was evidence in the patent that the patient population who are poor resistors of clopidogrel in fact had a response to S-oxo or to drug X, doesn't matter what the drug is, that it treated them at a certain effective rate. Like different dosage. Like different dosage, right. So, for example, if you found certain patients resistant to certain things required a higher or lower dosage of this to have the same level of effectiveness, that would be a subpopulation limitation that was meaningful, right? Right. You're correct, Your Honor. I think that's the point I was trying to make is if those people in need of the treatment for reducing clopidogrel had a different effective amount, that treating to that patient population would inform the administration steps. So it would change the administration steps. Just to make sure I understand something right, in the treatment using X-oxo to treat thrombosis or embolisms, isn't that true for patients regardless of whether they are clopidogrel resistant? That's correct, Your Honor. So it's kind of like in my simplistic way of explaining things, you know, you could take Tylenol for a headache or you could take Advil for a headache. Maybe Tylenol is not so effective for some people. So those people could take Advil. Guess what? All the people could have taken Advil. Like, what's the difference? That's correct, because the metabolite is then further metabolized in all patients to have the effect on platelets and treat or prevent. I guess the point I'm making, it's not like there's something special about the clopidogrel resistant people that makes X-oxo better for them than it would have been for any other person it was necessarily administered for. And even if there is something like that, it's certainly not described in this patent or in these claims. That's correct. There's nothing in the record or any facts that that's the case. Anything further? Thank you. All right. Thank you. Mr. Bretschneider, you have some rebuttals, don't you? Thank you, Your Honor. Just a couple of. So you're going to answer my question first, right? Do you agree that your obviousness arguments depend on the proffered claim construction? I'm sorry? Do you agree that your obviousness arguments depend on the proffered claim construction? Oh, yes. I think that goes without saying in a case like this. Just a couple of points. Point one, the director hasn't joined issues with the Janssen issue. Janssen is dead on point. And that's one thing. Another thing is let's talk about the supposed substantial evidence. The most important testimony that is relied upon is at Appendix 2079 to 2080, which is in the testimony of Dr. Gerbel, who is the expert used by Sun. Dr. Gerbel basically says that it's a routine matter to determine dosages if you know what the desired therapeutic effect is. If you know what it is, then you can determine it. But as this court has said in cases like Honeywell v. Mexican, just because something is routine doesn't make it unpatentable. Otherwise, the last sentence of 35 U.S.C. 103A, that patentability will not be negative by the manner in which the invention was made, is essentially of no consequence. Another point is let's look at what the board actually did here. Appendix 25, right in the middle lines 13 through 15, crystallized the board's decision. We need not reach whether the intended use of overcoming clopidogrel resistance would have been obvious as the intended use does not confer patentability. That's wrong. We've explained why. We needn't belabor the point any further. And that, Your Honor, unless the court has questions, concludes our presentation. Okay. I thank both counsel for their arguments. The case is taken under submission.